## Moore and Others *v.* McClintock.

Where to a bill in chancery an answer under oath was waived, under the statute, the effect of a denial in the answer was to require the allegations of the bill to be sustained by a preponderance of evidence only.

APPEAL from the *Grant* Circuit Court.

GOOKINS, J.—*McClintock* brought his bill in chancery against *Patterson Moore* and *Archibald Moore,* to set aside certain conveyances of land, alleged to be fraudulent, and to subject the land to the payment of a judgment he held as assignee of one *Briggs.*

The material allegations in the bill and an amendment thereto, are, that in *April,* 1845, *Briggs* obtained a judgment against *John Moore,* father of the appellants, in the *Grant* Circuit Court, for 180 dollars, which he assigned to *McClintock* in *October* of that year; that in *April,* 1846,

*McClintock* sued out a *fi. fa.* upon said judgment, which was returned *nulla bona;* that *John Moore* had no property except the land in question. The bill further states that in 1841, said *John Moore* was the owner of eighty acres of land, which is described, situated in said county of *Grant,* which he then mortgaged to one *Curtis,* to secure the payment of a debt of 91 dollars and 50 cents; that *Curtis,* at the *April* term, 1844, of the *Grant* Circuit Court, obtained a decree of foreclosure upon said mortgage against *John Moore,* under which the land in question was sold at sheriff's sale, on the 24th of *July,* 1844, to one *Sayre,* for 426 dollars and 68 cents; that after satisfying the execution, the overplus was paid by the sheriff to said *John Moore,* amounting to 307 dollars and 92 cents; that the sheriff conveyed the land to *Sayre,* in trust for the said *John Moore,* to be disposed of as he should thereafter direct, with intent to defraud *Moore's* creditors, and particularly the complainant; and that the claim of *Briggs* was then a subsisting debt. It is further alleged that said *John Moore* agreed to repay to *Sayre* the money he paid for the land; and that *Sayre,* at the instance of *John Moore,* on the 28th of *August,* 1844, conveyed the land to *Patterson Moore,* without consideration, or, if any, it was the same moneys *Sayre* had paid to the sheriff, for the use of *John Moore;* that *Patterson Moore* was then a young man, just arrived at twenty-one years of age, and without property or means of making said purchase; that the conveyance to him was the result of a fraudulent collusion between him and his father, and that he held the land as trustee. The bill further charged that *Patterson Moore,* on the 1st of *March,* 1850, conveyed the land, with a like fraudulent intent, and without consideration, to his brother, *Archibald Moore,* who had notice of the previous fraudulent transaction. It is further alleged that before the last-mentioned conveyance, on the 5th day of *February,* 1850, the honorable *Jeremiah Smith,* then president judge of the eleventh judicial circuit, having an interest in the judgment recovered by *Briggs* against *John Moore* (which is shown), and *McClintock,* filed their bill in the *Wabash* Cir-

cuit Court, (the county of *Wabash* being in another cir-
cuit, and adjoining the eleventh circuit,) which bill was
the same as the present bill, except that judge *Smith* was
a party complainant, whose official character was shown
by the bill, and *Patterson Moore* only was defendant.
That process was served on *Patterson Moore* on the 5th
day of *February*, 1850, and that said cause was continued
in the *Wabash* Circuit Court, until the 15th day of *March*,
1850, when it was dismissed, which the defendants well
knew.

*Patterson Moore* answered, admitting the recovery of the
judgment by *Briggs* against *John Moore;* but he denies
that the debt in favor of *Briggs* existed when he obtained
the conveyance from *Sayre* of the land in controversy.
He admits the assignment of *Briggs'* judgment to *Mc-
Clintock;* but denies the execution and return of *nulla
bona* thereon, and *John Moore's* insolvency, as alleged in
the bill. He admits *John Moore's* title to the land, his
mortgage to *Curtis*, its foreclosure, and the sale to *Sayre;*
but denies that he purchased at *John Moore's* instance, or
upon the trust alleged in the bill, or for the purpose of
defrauding his creditors, but says the purchase was *bona
fide.* He admits the conveyance of the land to him by
*Sayre;* but denies that it was without consideration, or
that the only consideration was the money which *Sayre*
had paid to *John Moore.* He admits that he attained
twenty-one years of age *November* 9, 1842; but says that
his father had given him his time, and released him from
his control three or four years before attaining his major-
ity, during which time he had accumulated property worth
400 or 500 dollars. He avers that he paid *Sayre* 600 dol-
lars for the land, a part of which was by conveying to
him the undivided half of a tract which he owned, and
for the residue he paid him 200 dollars, part of which he
obtained from his father on a previous indebtedness. He
admits his conveyance of the land to *Archibald Moore*,
but denies all the facts alleged in the bill tending to im-
peach that conveyance for fraud. He admits the filing
and pendency of the bill in the *Wabash* Circuit Court as

alleged, but denies the issuing and service of process thereon, and denies, also, all fraud, in the usual form.

The answer of *Archibald Moore* does not differ materially from that of his co-defendant. He avers that his purchase was for a valuable consideration, without any knowledge or notice of the alleged fraud, avers the payment of most, but not all, of the purchase-money, &c.

The complainant waived the oath of the defendants to their answers, pursuant to the statute; and the effect of the denial in the answers was to require the allegations of the bill to be sustained by a preponderance of evidence only.

*Sayre* testified that he bought the land in question at the sheriff's sale, at *John Moore's* request, and on his promise to refund the purchase-money within ten days, which he failed to do; that he paid for it mostly in *Indiana* banknotes, on about fifteen of which he had a private mark; that within a month or six weeks afterwards, he conveyed the land to *Patterson Moore*, in exchange for land conveyed to him by *Moore*, receiving about 200 dollars for the difference, in bank-notes which he believed to be those he had paid *John Moore*, ten or twelve of which he recognized by his private mark.

*Hugh M. Stevenson* testified that in 1842 *Patterson Moore* was a young man, about twenty; that between 1842 and 1844, *John Moore* became indebted to him for a bill of costs, amounting to about 15 dollars. In 1845, he told *Patterson Moore* he intended to proceed against this land for his costs; that he believed he could prove the conveyance to him to be fraudulent; when he promised to pay his debt, and subsequently paid it. *John Moore* was reputed good in 1841 or 1842, but in 1844 or 1845 was understood to be insolvent. He did not know of *Patterson Moore* owning any property, or having any other means than what was about his father's farm.

*Jacob Line* testified that in 1847, *John Moore* was very much involved, and in doubtful circumstances; that *Patterson Moore* was then a young man, living with his father; that he owned no land that witness knew of; that he might

have had some small amount of personal property; that he was present at the execution of the deed from *Patterson* to *Archibald Moore*, and that no consideration was paid at that time.

*John Brownlee* proved the pendency and dismissal of the bill in the *Wabash* Circuit Court, the identity of the parties (except judge *Smith* and *Archibald Moore*,) and of the subject-matter, as stated in the bill.

This was all the testimony offered for the complainant.

For the defendants, *Abraham Bish* testified that from 1842 to 1845, there was considerable property on the premises of *John Moore*, but he did not know who owned it. It was worth, at a low estimate, 200 dollars. The land in question was then worth from 600 to 800 dollars, and the land which *Patterson Moore* alleges he conveyed to *Sayre* was worth 350 dollars in 1844. He was the nearest neighbor of *John Moore*, and had a tolerably accurate knowledge of his indebtedness, which he thought did not exceed about 500 dollars at that time; and that besides the land in dispute, another tract was worth 350 dollars, of which he owned the undivided half.

*Andrew J. Harlan* testified that *Patterson Moore* in fee the tract he exchanged to *Sayre* for the lan troversy; that he made the exchange and paid 20 dollars for the difference; that he had worked for his fathe two years after he became of age, at the time of his ex change; that the land he sold to *Sayre* was wo dollars; that *John Moore* was at that time somewhat barrassed, but not beyond his ability to pay.

This was all the defendants' evidence.

Upon this evidence, the Circuit Court decreed that the land in controversy was held in trust by the defendants, and that it was liable to the claim of the complainant, fixing the amount; and ordered it to be sold in default of payment of the sum due. The decree does not, in terms, declare the conveyances to *Patterson* and *Archibald Moore* fraudulent; but we presume the Court below proceeded upon that ground, as no trust was pretended to have arisen in any other form.

We are not able to see upon what principle this decree can be sustained. Fraud is usually proved by circumstances, but the facts relied on to establish it must be of such a character as, at least, to raise a strong presumption of a corrupt intent in the vendee. Of the controverted facts, very few, if any, are proved. The bill alleges that *John Moore* was insolvent at the time *Sayre* purchased the land, in *July*, 1844, at the sheriff's sale, and that the demand on which *Briggs* obtained his judgment in 1845, was then a subsisting debt. Of the latter fact no evidence was given. *Stevenson* testifies that in 1844 or 1845, *John Moore* was understood to be insolvent, and *Line* testifies that in 1847 he was in doubtful circumstances, and much involved. This was all the plaintiff's proof on that point, to attack a conveyance made in *August*, 1844. The return of *nulla bona*, which the answer denied, was not given in evidence. In opposition to this, the defendants proved, by *Bish*, that *John Moore* was in possession of personal property worth, at least, 200 dollars; that besides the land in dispute, valued at from 600 to 800 dollars, he had an interest in another tract worth 175 dollars. That was subject to the lien of the judgment, and no reason is shown why it was not taken in execution. *Harlan* testifies that *John Moore* was somewhat embarrassed, but not beyond his ability to pay.

The bill alleges that *Sayre* conveyed the land to *Patterson Moore*, at his father's request, who paid the consideration. There is no proof that *John Moore* knew even of *Patterson Moore's* purchase. *Sayre* and *Harlan* testify that it was paid for in land, and 200 dollars in money; and *Harlan* testifies that this land belonged to *Patterson Moore* in fee, and that it was worth 400 dollars. The only circumstance of a suspicious character is, that *Sayre* received from *Patterson Moore* a portion of the same money he had paid to the sheriff, and *Patterson Moore's* admission that he received part of the money he so paid from his father. It is proved, however, that he had worked for his father two years after he became of age; and although that fact would not raise an assumpsit in his favor against

his father, it is a circumstance proper to be considered in determining the *bona fides* of the transaction.

It is insisted that the conduct of *John Moore*, in permitting his land to be sold for so small a sum, and allowing his son to purchase it from *Sayre*, is evidence of fraud. The proof is that he requested *Sayre* to buy the land, promising to redeem it within ten days, which he failed to do. *Sayre* saw him afterwards, and he again promised, saying he thought he could get the money. Nothing further occurred until a month or six weeks after *Sayre's* purchase, when he sold the property to *Patterson Moore*, who paid him for it without any intervention of *John Moore*, so far as is shown by the testimony. It is not shown that *John Moore* received the rents and profits, or any other benefit from the land after that time.

It is further shown that *Patterson Moore* paid 15 dollars on being threatened with a suit in reference to the land. We think it not difficult to vindicate the wisdom of that measure, supposing his title in no danger of a successful attack. The sum paid would have gone but a small way towards defending a chancery suit.

The most that can be said of the facts in this case is, that they raise some suspicion of unfairness. They seem to us to come very far short of that degree of certainty which is necessary to establish fraud.

As the title of *Patterson Moore* is not successfully attacked, there is no occasion to examine the validity of his conveyance to the other defendant.

*Per Curiam.*—The decree is reversed with costs. Cause remanded, with instructions to the Circuit Court to dismiss the bill.

*A. J. Harlan* and *C. H. Test*, for the appellants.

*J. Brownlee*, for the appellee.